Patrick J. McGroder III (002598)
Email:  pjm@gknet.com
Shannon L. Clark (Bar No. 19708)
Email:  slc@gknet.com
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8194
Facsimile:    (602) 530-8500
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Vernon Parker and Lisa Farringer Parker, Husband and Wife, | **COMPLAINT** |
| Plaintiffs, | **(Abuse of Process, Negligent Supervision)** |
| v. | |
| United States of America, | |
| Defendant. | |

Vernon Parker and Lisa Farringer Parker, for their Complaint against the United States of America, hereby allege as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.     Plaintiffs Vernon Parker ("Mr. Parker") and Lisa Farringer Parker (together "the Parkers"), are husband and wife.

2.     At all relevant times, the Parkers were residents of Maricopa County, Arizona.

3.     Defendant United States of America is a government entity.

4.      No real property is involved in this action.  Thus, venue is proper in this Court under 28 U.S.C. §§ 1391(e) and 1402(b).

5.      This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq.

6.      Jurisdiction is proper under 28 U.S.C. § 1346(b).

## PROCEDURAL BACKGROUND

7.      Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

8.      On or about September 18, 2009, an administrative complaint (Form 95 notice of claim) in the aggregate amount of $2,000,000.00 was made by the Parkers with the United States Small Business Administration ("SBA").

9.      On or about March 12, 2010, the SBA, through Karen Holzen, denied the Parkers' claim.

10.     The present Complaint has been filed no later than six months from the date of the SBA's denial of the Parkers' claim.

## FACTUAL BACKGROUND

### General Statement

11.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

12.     The Parkers have been irreparably harmed as a result of a biased, abusive and politically-driven investigation by the SBA's Office of the Inspector General ("OIG"), a subdivision of the SBA.

13.     Other SBA personnel participated in and guided this investigation, aided and abetted the OIG in perverting the investigative process for political gain, segued the OIG investigation into the termination of Mr. Parker's company from an SBA program, and took intentional, bad-faith measures to ensure that the OIG's investigation would not be exposed as a sham when Mr. Parker challenged the SBA's attempt to improperly dismiss his company from an SBA program.

14.     Furthermore, the SBA also negligently supervised, retained, and actively encouraged personnel who participated in the above misconduct.

**VBP Group's Acceptance into the 8(a) Program.**

15.     Mr. Parker served as the first-ever Assistant Secretary for Civil Rights at the United States Department of Agriculture ("USDA") from April 2003 through January 2006.  During his tenure at USDA, he defended the Department from discrimination complaints.

16.     In February 2006, having left Federal employment, Mr. Parker formed the VBP Group, LLC ("VBP").

17.     VBP is a consulting firm that assists companies and government agencies develop best practices in Human Resources, training, consensus building, EEOC, and other areas.

18.     Based upon his performance as Assistant Secretary for the USDA, several companies readily entered partnerships with VBP, including the Gallup Corporation and BearingPoint.

19.     Given Mr. Parker's high skill level and experience in the areas of Human Resources and consensus-building, Mr. Parker decided that VBP had the

necessary experience and talent to compete for government contracts under the SBA

8(a) BD program.

20.     On February 17, 2006, VBP applied to the 8(a) Program.

21.     On April 20, 2006, VBP was rejected from the 8(a) Program by the

SBA.

22.     Upon information and belief, the SBA based its rejection on its

finding that VBP had not been in business for the required two-year period.

23.     The SBA also asked for additional proof that VBP had a track

record of performance on contracts.

24.     The two-year requirement is routinely waived, pursuant to 13

C.F.R. § 124.107(b), if the applicant has the necessary expertise in the field in which the

applicant has applied.

25.     VBP had successfully completed several contracts, including some

for the USDA, Mr. Parker's former federal employer.

26.     The SBA allowed VBP the option to resubmit its application upon

addressing the above concerns.

27.     In preparation for resubmitting the application, Mr. Parker worked

very closely with Anita Gibson, an SBA Business Opportunity Specialist at the Arizona

SBA Office ("Arizona SBA").[1]

---

[1] For ease of reading, the terms "Arizona SBA," "D.C. SBA," and "OIG"  will be used
to describe the actions of each unit with the SBA.  However, the SBA is one entity and a
subdivision of the United States; all acts alleged against any unit, work  team, office,
division, or department are alleged against the SBA as a whole (including its OIG), and
therefore, against the United States.

28.     Ms. Gibson's job was to assist companies like VBP in preparing the necessary documentation, answer questions and give advice about the application process, and generally shepherd VBP through the intricacies of the 8(a) application process.

29.     Throughout the initial application process and the re-application process, Ms. Gibson gave Mr. Parker and another VBP member, Gary Marx, advice on what information VBP should include to give VBP the best chance at receiving a waiver of the two-year requirement.

30.     She offered suggestions about areas to address in his application, and even made document-level edits to VBP's materials.

31.     Ms. Gibson told Mr. Parker that the VBP application was strong, and told him that many applicants are initially rejected.

32.     Ms. Gibson was aware that SBA looks at the track record of an applicant in determining eligibility and stated that many firms had been approved with far less experience than VBP.

33.     In a conference call during the reapplication process, Mr. Parker told Ms. Gibson that VBP had completed significant contracts with the USDA, among other organizations.

34.     Mr. Parker also explained that the success of VBP's contracts (and subsequently, VBP's business) revolved around building long-term business relationships with clients.

35.     Mr. Parker also explained that much of VBP's work with the USDA and other clients was ongoing, rather than discrete, short-term projects.  In other

words, VBP's contract with some organizations, including the USDA, did not have an end date.

36.     For the USDA contract, VBP was paid based upon the number of hours of work Mr. Parker performed for the USDA.

37.     As a result of the ongoing nature of the work for the USDA, it was impractical for VBP to send USDA invoices.

38.     However, VBP nevertheless maintained invoices merely for internal recordkeeping and to keep a record of work completed.  These invoices were in the same form as invoices that VBP issued for other clients.

39.     Mr. Parker explained VBP's arrangement with the USDA to Ms. Gibson, including the existence and purpose of the internal recordkeeping invoices.

40.     Ms. Gibson told Mr. Parker and Mr. Marx that these invoices were sufficient proof of contract performance, and instructed VBP to submit these invoices in support of VBP's 8(a) reapplication.

41.     Mr. Marx was present telephonically during this discussion, and executed an affidavit confirming the content of the conversation.  *See* Affidavit of Gary Marx, August 15, 2008, attached hereto as **Exhibit** 1.

42.     In an effort to provide the SBA with additional proof that VBP had a contractual relationship with the USDA, Dale Moore, the Chief of Staff of the USDA, wrote a letter confirming that VBP had, indeed, completed "assignments" for the USDA.

43.     At the request of Ms. Gibson, Mr. Parker obtained a second letter from Mr. Moore, with the word "assignments" replaced by the word "contracts,"

6

1  because Ms. Gibson stated that the use of the term "assignments" might confuse the

2  SBA reviewer.   *See* Exhibit 1.

3          44.     On or about May 30, 2006, Mr. Parker submitted VBP's

4  reapplication to the SBA, including the revised letter from Mr. Moore, and the internal

5  invoices, among numerous other documents that supported VBP's fitness for the 8(a)

6  Program.

7          45.     On June 8, 2006, VBP was accepted into the 8(a) Program.

8                  **VBP's Performance in the 8(a) Program.**

9          46.     It took approximately 13 months before VBP obtained its first

10  federal contract under the 8(a) program.

11          47.     However, once VBP obtained contracts, it completed them with

12  great success.

13          48.     The SBA selected VBP to participate in the Super Bowl Leadership

14  Forum, a forum hosted by the SBA showcasing small business success stories.

15          49.     VBP was the only 8(a) Program company selected to present at the

16  forum.

17          50.     Mr. Parker received rave reviews for his inspiring and informative

18  presentation at the Leadership Forum.

19          51.     VBP also performed a contract for the United States Department of

20  Homeland Security ("DHS").

21          52.     The Program Administrator from DHS indicated that VBP

22  "exhibited exemplary contractor performance."

23

7

1    53.    This resulted in VBP being nominated for the DHS Small Business

2    of the Year Award.

3    **The OIG Investigation**

4    54.    Given VBP's success and general reputation for excellent work as

5    a government contractor, VBP was awarded a $1.2 million contract to conduct training

6    for the SBA.

7    55.    Mr. Parker knew none of the SBA's contract-awarding decision

8    makers before he was awarded this contract.

9    56.    The previous contractor, USSMC, did not have its contract

10   renewed by the SBA.

11   57.    The owner of USSMC, Brenda Campbell, approached

12   Congresswoman Nydia Velazquez, the Democratic Chairwoman of the House

13   Committee on Small Business.

14   58.    Although it took VBP <u>13 months</u> to obtain any federal contracts,

15   and in spite of VBP's stellar performance, Brenda Campbell alleged that Mr. Parker

16   used political influence to obtain the SBA contract.

17   59.    On February 7, 2008, the House Committee on Small Business had

18   a committee meeting.

19   60.    At the meeting, Ms. Velazquez raised questions about VBP's

20   credentials and the award of the SBA contract.

21   61.    Steven Preston, the SBA administrator present at the meeting, was

22   thoroughly questioned by the Committee.

23

8

62. Ms. Velazquez would later remark in a press release that, although the SBA had to cut programs due to a lack of funding, "[i]t seems they only have money for Republican cronies."

63. This spurious and unfounded soundbite was posted on Ms. Velazquez's official website, at http://www.house.gov/velazquez/newsroom/nv-in-news/02-19-08-nyt-sbc.html.

64. As the Chairperson of the Committee, Ms. Velazquez had significant control over the SBA's funding.

65. Normally, agencies will conduct their own internal fact-finding prior to engaging the Office of the Inspector General ("OIG").

66. However, upon information and belief, spurred into action by the dressing-down Mr. Preston received before the Committee during a hearing on the SBA's budget on February 7, 2008, the OIG immediately began an investigation.

67. On February 8, 2008, the day after the Committee meeting, Mr. Preston drafted a letter to Eric Thorson, the Inspector General for the SBA.

68. In the letter, Mr. Preston asked Mr. Thorson to investigate.  Mr. Preston stated the following concerns:

    a.  Mr. Parker was former USDA employee;

    b.  VBP was founded soon after Mr. Parker resigned from the USDA;

    c.  VBP was accepted in June 2006 to the 8(a) Program;

    d.  As a result of the $1.2 million contract award, VBP was the largest training provider for the SBA.

69.     A copy of this letter is attached hereto as **Exhibit** 2.

70.     On or about February 11, 2008, Mr. Parker notified Ms. Gibson, who had guided him during the 8(a) application process, and Shivani Desai, Arizona SBA Associate Director for Business Development, about the allegations made by Ms. Velazquez and Ms. Campbell.

71.     Ms. Desai wrote: "We know how hard you worked for your certification and yes, the 2 year can be waived as you well know. This will pass. Thanks for letting us know. Keep on truckin along."  *See* Email from Shivani Desai, February 11, 2008, attached hereto as **Exhibit** 3.

72.     During the first half of 2008, OIG Special Agent Lee Bacon investigated VBP.

73.     Agent Lee Bacon is a member of the SBA OIG.

74.     Agent Bacon is an officer of the United States, and is empowered by law to execute searches, seize evidence, and make arrests for violations of Federal law.

75.     At all times Agent Bacon acted within the course and scope of his employment with the SBA OIG.

76.     On March 20, 2008, Agent Bacon interviewed Dale Moore, the USDA Chief of Staff who had authored letters in support of VBP's early admission into the program.

77.     Agent Bacon showed Mr. Moore the two recommendation letters: the letter that used the term "assignments" and the letter that Ms. Gibson requested, which used the term "contracts."

78.     The letters were on different letterhead, but almost identical in text.

79.     Mr. Moore confirmed that he authored both letters.

80.     Mr. Moore confirmed that he had initially drafted the letter using the term "assignment."  Mr. Moore then explained that he executed a new letter when Mr. Parker's SBA Representative, Ms. Gibson, requested a new version of the letter.

81.     Mr. Moore executed an affidavit confirming these events.  *See* Declaration of Dale Moore, August 18, 2008, attached hereto as **Exhibit** 4.

82.     Agent Bacon also interrogated Mr. Parker by showing his badge and placing him under oath in a dark basement room.

83.     Mr. Parker explained to Agent Bacon that the letters signed by Mr. Moore were authentic.

84.     Upon information and belief, Agent Bacon knew the letters were authentic at the time he interrogated Mr. Parker.

85.     During the interrogation, Mr. Parker also explained to Agent Bacon that Ms. Gibson told him to submit the draft USDA invoices in support VBP's 8(a) reapplication.

86.     Mr. Parker also told Agent Bacon that Ms. Gibson knew that the invoices that VBP submitted in support of its 8(a) reapplication were never submitted to the USDA, and only internal records for VBP.

87.     Mr. Parker followed up by sending a letter to Agent Bacon, detailing the same facts.  *See* Letter from Vernon Parker to Special Agent Lee Bacon, June 2, 2008, attached hereto as **Exhibit** 5.

**Publication of the OIG Report**

88.     On July 18, 2008, the OIG published a report entitled "Report on Acceptance of VBP Group into the 8(a) program and Subsequent Contract Award by the Small Business Administration (SBA)."

89.     A copy of the report (herein "the Report") was posted on the SBA's website.

90.     As of the filing of this Complaint, the report remains on the website. *See* http://www.sba.gov/idc/groups/public/documents/sba/oig_gcbd_8-16.pdf.

91.     The Report made numerous scurrilous and unsupported allegations, including:

        a.  Mr. Parker "altered" the letter Dale Moore submitted on behalf of the VBP for its 8(a) reapplication;

        b.  Mr. Parker submitted documents that "were false or of questionable authenticity";

        c.  The SBA approved Mr. Parker's application electronically, out of the normal course of business;

        d.  VBP misrepresented contract income.

92.     Even though Agent Bacon <u>knew</u> from his March 2008 interview of Dale Moore that both letters were authentic, Agent Bacon, willfully and in bad faith, lied in the Report, claiming that Mr. Parker "altered" the letters.

93.     In fact, Agent Bacon omitted any and all mention of his interview of Dale Moore in the OIG report as well as other USDA officials who had exonerated

1   Mr. Parker.  Nor did he list other exculpatory evidence he gathered, including his

2   interviews with Gary Marx and Shivani Desai.

3          94.    Upon information and belief, Agent Bacon had confirmed with Ms.

4   Gibson that she instructed VBP to submit the USDA invoices in support of VBP's 8(a)

5   reapplication.

6          95.    Nevertheless, Agent Bacon also omitted the content of his

7   discussion from the Report.

8          96.    As demonstrated by the blatant omissions and false statements in

9   the Report, the SBA OIG failed to properly supervise the investigation conducted by

10  Agent Bacon.

11                          **Letter of Intent to Terminate**

12         97.    On July 3, 2008, Robert Blaney, the Director of the Arizona SBA

13  sent VBP a Letter of Intent to Terminate VBP from the 8(a) Program.  *See* Letter of

14  Intent to Terminate from the 8(a) BD Program, July 3, 2008 ("Letter of Intent"),

15  attached hereto as **Exhibit** 6.

16         98.    Although the Letter of Intent bore Mr. Blaney's name, it was, in

17  fact, drafted by the Office of General Counsel and forwarded to Mr. Blaney to sign.

18         99.    The SBA Office of Field Operations, in conjunction with the Office

19  of General Counsel and Office of Business Development, ordered Mr. Blaney to

20  transmit the letter.  *See* Letter from Robert Blaney to LeAnn Delaney, October 16, 2008

21  ("Blaney Letter"), attached hereto as **Exhibit** 7.

22         100.   The letter set out several bases for terminating VBP from the 8(a)

23  Program:

     a. Mr. Parker was a Federal employee at the time VBP applied to the 8(a) Program, and therefore, Mr. Parker misstated his status on the 8(a) Application;

     b. Mr. Parker forged the Dale Moore letters;

     c. Mr. Parker submitted falsified invoices in support his contract performance with the USDA;

     d. Mr. Parker failed to maintain management and control of his business;

     e. Mr. Parker failed to seek approval from the SBA before running for a Council seat and for Mayor of the Town of Paradise Valley.

   101. The letter also accused Mr. Parker of criminal conduct, including a violation of 18 U.S.C. § 1001 (submitting false statements).

   102. At the time the Letter of Intent was sent, the SBA knew that the allegations were unfounded and false.

   103. For example, the claim that Mr. Parker failed to notify or seek approval from the SBA before running for Town Council or Mayor was quickly disproven using documents that were already within the possession of the SBA prior to the posting of the Report and the drafting of the Letter of Intent. *See* Letter from Vernon Parker to Anita Gibson, March 7, 2008, attached hereto as **Exhibit** 8; Letter from Vernon Parker to Anita Gibson, June 11, 2008, attached hereto as **Exhibit** 9; Emails between Vernon Parker and Anita Gibson, March/June 2008, attached hereto as **Exhibit** 10.

104.   Upon information and belief, the purpose of the Letter of Intent was to "legitimize" the unlawful and abusive investigation conducted by Agent Bacon, and to provide plausible deniability of the SBA's efforts to appease Congresswoman Velazquez and protect its budget.

**VBP's Response To SBA's Letter of Intent**

105.   Upon receiving the Letter of Intent, Mr. Parker retained counsel to assist him and VBP to rebut the charges in the Letter of Intent.

106.   Mr. Parker's attorneys contacted the Arizona SBA; however, Lara Hudson, an attorney in the Office of General Counsel for the SBA in Washington, D.C. ("D.C. SBA") was assigned as the point of contact between the SBA and Mr. Parker.

107.   Ms. Hudson explained the process that would be used for VBP to respond to the allegations.

108.   Ms. Hudson explained that the inquiry would begin at the Arizona SBA.

109.   The Arizona SBA would consider any documentation VBP provided to refute the allegations.

110.   Ms. Hudson told counsel that if the Arizona SBA found in favor of Mr. Parker, the inquiry would end.

111.   On August 21, 2008, VBP submitted an extensive written response, which painstakingly refuted each and every allegation brought by the SBA and included a panoply of supporting documents.

112.   On September 4, 2008, Mr. Parker and Paul Charlton and Flynn Carey, Mr. Parker's attorneys, met with the Arizona SBA at the Phoenix SBA Office.

113.     The purpose of this meeting was for VBP to make an oral presentation to the SBA.

114.     Present for the SBA was Martha Nesbitt, Regional Counsel for the SBA, and Ms. Desai.

115.     Ms. Hudson and David Fishman, both from the SBA Office of General Counsel, were present telephonically.

116.     On October 3, 2008, Ms. Desai sent a letter to Joseph Loddo, SBA's Director of Business Development.  *See* Letter from Shivani Desai to Joseph Loddo, October 3, 2008, attached hereto as **Exhibit** 11.

117.     In the letter, Ms. Desai acknowledged that Mr. Parker had refuted several of the SBA's claims, but noted that the Arizona SBA was unable to make a recommendation.

118.     On October 10, 2008, LeAnn Delaney, Deputy Director for Business Development, emailed Robert Blaney, Ms. Desai's supervisor and the SBA District Director for Arizona.  *See* Email from LeAnn Delaney, attached hereto as **Exhibit** 12.

119.     In the email, Ms. Delaney asked: "Has VBP provided sufficient evidence to overcome the intent to terminate letter?"

120.     On October 16, 2008, Mr. Blaney responded via letter to Ms. Delaney and copied Mr. Loddo.

121.     In the letter, Mr. Blaney concluded: "The information provided in Mr. Parker's Response to the Letter of Intent, the September 4th meeting, and the supplemental information provided to this office appears sufficient to support the

1    reasonable belief that Mr. Parker has overcome the issues raised in the Letter of Intent

2    to Terminate VBP Group."

3         122.   Pursuant to the procedure outlined by Ms. Hudson to Mr. Carey

4    and Mr. Charlton, the decision by the Arizona Office should have ended the inquiry,

5    and VBP's 8(a) status should have been reinstated.

6         123.   However, the D.C. SBA moved forward with termination, in

7    violation of the process guaranteed by Ms. Hudson.

8         124.   Not only did the D.C. SBA deprive VBP and Mr. Parker of the

9    guaranteed process, the SBA did not disclose, and actively covered up, the favorable

10   decision by the Arizona SBA.

11        125.   The D.C. SBA denied that it had promised VBP and Mr. Parker a

12   particular process, and actively prevented Mr. Parker's counsel from having any access

13   to the Arizona SBA.

14        126.   In fact, VBP's counsel only learned about the existence of the

15   October 3, 2008 Desai Letter and the favorable October 16, 2008 Blaney letter when the

16   SBA was procedurally obligated to produce the record related to VBP in a subsequent

17   Administrative Appeal.

18        127.   On November 26, 2008, counsel for Mr. Parker met telephonically

19   with the D.C. SBA to again discuss the SBA's intention to terminate

20        128.   The SBA was represented by Mr. Loddo, Mr. Fishman, and Ms.

21   Hudson.

22

23

129.    Toward the end of the conversation, Mr. Fishman heatedly exclaimed that had the SBA wanted to, it could simply rely on the OIG Report to terminate the VBP from the 8(a) Program.

130.    This confirmed that the SBA had long since abandoned even trying to maintain a veneer of impartially, and would rely upon on a report that was rife with proven inconsistencies.

131.    On December 16, 2008, Mr. Loddo sent Mr. Parker's counsel a Notice of Termination, attached hereto as **Exhibit** 13.

132.    The list of reasons for terminating VBP from the 8(a) Program had been significantly reduced from the bases described in the July 3, 2008, Letter of Intent.

133.    The SBA dismissed the allegation that Mr. Parker had falsified the Moore Letters.

134.    The SBA dismissed the allegation that Mr. Parker had failed to notify the SBA about his campaign for Town Council and Mayor.

135.    The SBA dismissed an allegation that Mr. Parker had failed to maintain day-to-day control over VBP.

136.    The SBA focused its decision to terminate on an allegation that Mr. Parker was still a Federal employee at the time of completing the VBP 8(a) application.

137.    The SBA also claimed that Mr. Parker had submitted falsified invoices showing work completed for the USDA.

138.    The allegation concerning the invoices involved the very same invoices that Ms. Gibson had instructed Mr. Parker to submit to the SBA in support of VBP's reapplication to the 8(a) Program.

139.    On January 28, 2009, Mr. Parker appealed the termination to the Office of Administrative Hearings.

140.    On March 18, 2009, Karen Holzen, an attorney with the SBA Office of General Counsel, filed the SBA's response to VBP's Appeal Petition.

141.    In the face of overwhelming documentary evidence to the contrary, the SBA claimed that VBP was <u>not</u> promised that a favorable finding by the Arizona SBA would end the inquiry.

142.    In its Response, the SBA also claimed that the Arizona SBA was unable to reach a determination.

143.    In support of this claim, the SBA cited only to the earlier letter authored by Ms. Desai and did not mention the Blaney Letter anywhere in its response.

144.    Although there was significant additional briefing throughout the pendency of the Administrative Appeal, the SBA never tried to correct or justify its misrepresentation of the record.

145.    On March 2, 2009, Mr. Carey, counsel for Mr. Parker and VBP, demanded that the SBA take down the inaccurate and misleading Report.  *See* Letter from Flynn Carey to Karen Holzen, March 2, 2009, attached hereto as **Exhibit** 14.

146.    Mr. Carey emphasized that many of the allegations in the Report had been definitively rebutted.

147.    Ms. Holzen forwarded the letter to Glenn Harris, Counsel for the Inspector General.

148.    Although Mr. Harris promised to "review the letter and respond as appropriate," he did nothing.

149.    The proven-false information in the Report remains available to the public to this day on the SBA's website.

150.    On June 23, 2009, OAH rendered its final decision on VBP's appeal.

151.    The OAH only considered one allegation: that Mr. Parker was still a federal employee at the time of VBP's application to the 8(a) Program.

152.    The OAH concluded only that the SBA was not arbitrary and capricious in its decision to terminate VBP on the grounds that Mr. Parker may have been an employee at the time of his application because the evidence was capable of differing interpretations on this point.

153.    The OAH did not consider any other allegation raised by the SBA, nor did it probe the underlying motivations for the SBA's investigation and subsequent termination of VBP from the 8(a) Program.

154.    As a result of this improper and abusive process and the government's negligent failure to supervise and control its employees, Plaintiffs suffered financial and emotional harm, loss of income and income opportunities, incurred costs and attorneys' fees and suffered other general and special damages in an amount to be proven at trial.

**Count I**

**(Abuse of Process)**

155.    Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

156.   The United States, by and through its employees/agents, committed numerous willful acts during the entire range of procedures incident to the litigation process.

157.   The United States' purpose in committing these acts was for an ulterior purpose not proper in the regular conduct of the proceedings.

158.   The United States' used the investigatory process and subsequent processes to accomplish goals for which those processes were not designed.

159.   Specifically, Agent Bacon willfully misused the investigatory process for the purpose of removing VBP from the 8(a) Program.

160.   The underlying purpose of the investigation was <u>not</u> to protect the integrity of the 8(a) Program, nor to investigate any perceived wrongs committed by VBP.

161.   Rather, the ulterior purpose of Agent Bacon's and the SBA's investigation was to penalize VBP for its success in the program, and curry favor on behalf of the SBA with Congresswoman Velazquez and the former contractor who contacted her office, Brenda Campbell.

162.   Use of the OIG investigatory process for the purpose of placating a vocal politician who exerts financial control over a government entity is not proper in the regular conduct of an OIG investigation.

163.   Agent Bacon, utilizing his law enforcement powers, with participation from the OIG, and with approval and guidance from SBA officials, willfully authored the Report which included numerous falsehoods and misleading information.

164. At the time of authoring the report, Agent Bacon knew that information he included in the report was false.

165. Agent Bacon knew that information he included in the report was false because he had spoken to Dale Moore and Anita Gibson.

166. Agent Bacon believed and intended that his willful inclusion of false information in the Report would assist the SBA in terminating VBP from the 8(a) Program because it would establish a foundation from which the SBA could move forward in the termination process.

167. The SBA knew of, and sanctioned, Agent Bacon's actions, as evidenced by the SBA's immediate referral of the matter to the OIG, the speed at which the matter was referred, and the SBA's statement, through Mr. Fishman, that the SBA could simply rely on the Report as the basis for termination of VBP if it so chose, among other evidence.

168. The SBA aided and abetted the subversion of the investigative process and the process by which VBP was to address and rebut the statements in the OIG report. These processes are inextricably intertwined.

169. The SBA provided support to Agent Bacon by incorporating the OIG's false and disproven statements into the Letter of Intent to Terminate.

170. The SBA also provided support and aid to Agent Bacon by weighting the termination process against Mr. Parker and VBP and making it impossible for Mr. Parker and VBP to prevail.

171.    As discussed throughout the Complaint, the termination process, which was inextricably intertwined with the investigative process, was weighted against Mr. Parker and VBP from the start.

172.    The SBA promised that the process would conclude upon a favorable determination by the Arizona SBA.

173.    However, when VBP was exonerated by the Arizona SBA, the D.C. SBA took over the proceedings and termination process, to ensure that VBP was removed from the 8(a) Program.

174.    The SBA's abuse of process continued during the Administrative Appeal, in which counsel for the SBA misstated the record and attempted to deflect attention from evidence that confirmed the sham nature of the OIG/SBA process.

175.    At all times, the SBA/OIG acts and omissions were undertaken within the course and scope of agency with Defendant and Defendant is responsible for its agents and agencies' conduct.

176.    As a direct and proximate result of the SBA/OIG aiding and abetting the commission of the abuse of process against Plaintiffs by Agent Bacon, and by directly participating in numerous abuses of processes, as well, Plaintiffs have suffered and will continue to suffer grievous financial losses, loss of business opportunities, emotional harm and irreparable mental pain and suffering in an amount to be proven at trial.

1

2

**Count II**

**(Negligent Supervision)**

3      177.   Plaintiffs hereby incorporate all preceding paragraphs as though

4   fully set forth herein.

5      178.   Defendant and its employees/agents are and were responsible for

6   the training, supervision, discipline, and control of their employees, including agents in

7   the OIG, staff members of the Arizona and D.C. SBA, attorneys employed by the SBA,

8   and any other officials, employees, or agents who are employees or agents of the SBA.

9      179.   Defendant and its employees/agents had a duty to properly

10   supervise these agents and employees.

11      180.   Defendant and its employees/agents knew, or should have known

12   through the exercise of reasonable care, that Agent Bacon, Lara Hudson, Karen Holzen,

13   Eric Thorson, Joseph Loddo, and Steven Preston were acting in an unlawful manner by

14   promoting, furthering, concealing, and attempting to give legitimacy to a politically-

15   motivated and wholly-unfounded investigation.

16      181.   Despite actual and/or constructive knowledge that Agent Bacon,

17   Lara Hudson, Karen Holzen, Eric Thorson, David Fishman, Joseph Loddo, and Steven

18   Preston were acting in an unlawful manner by promoting, furthering, concealing, and

19   attempting to give legitimacy to a politically-motivated and wholly-unfounded

20   investigation, Defendant and their employees/agents negligently supervised the above-

21   listed employees/agents, among others, which created an unreasonable risk of harm to

22   the public and the Plaintiffs.

23

182.     Despite actual and/or constructive knowledge that Agent Bacon, Lara Hudson, Karen Holzen, Eric Thorson, Joseph Loddo, David Fishman and Steven Preston were acting in an unlawful manner by promoting, furthering, concealing, and attempting to give legitimacy to a politically-motivated and wholly-unfounded investigation, and in conscious disregard of same, Defendant negligently failed to undertake reasonable and prudent measures to protect Plaintiffs and the public.

183.     Defendant repeatedly overlooked the acts of the above-named employees/agents and allowed Plaintiffs to be placed in circumstances where they were subjected to harm.

184.     As a direct and proximate result of the negligent, careless, and reckless acts and omissions of Defendant, Plaintiffs have suffered and will continue to suffer, lasting, and permanent injuries which have caused grievous financial losses, emotional harm, and mental pain and suffering, all to their detriment in an amount to be proven at trial.

## **PRAYER**

WHEREFORE, Plaintiffs pray judgment for damages as follows:

1.     For damages for injuries sustained due to the abuse of process and negligence of United States of America, including past and future medical expenses, lost wages, loss of future wages, financial damages, emotional harm and pain and suffering, in the sum according to proof at trial not to exceed $2,000,000 in the absence of newly-discovered evidence;

2.     For costs incurred herein as allowed by law;

3.     For post-judgment interest as allowed by law; and

4.    For such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 2nd day of July 2010.

GALLAGHER & KENNEDY, P.A.

By_____s/Shannon L. Clark_____
    Patrick J. McGroder III
    Shannon L. Clark
    2575 East Camelback Road
    Phoenix, Arizona 85016-9225
    Attorneys for Plaintiffs Parker

2495527/21654-0002

26